UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STEVEN M. MCCLAM II,

                Plaintiff,

   v.

KING COUNTY JAIL, et al.,

                Defendants.

Case No. C19-96-RAJ-MLP

REPORT AND RECOMMENDATION

## I.  INTRODUCTION

In this 42 U.S.C. § 1983 civil rights action, Plaintiff, who is currently a state prisoner, alleges King County Corrections Officer Frantz Verhelst ("Defendant") used excessive force against him while he was a pretrial detainee at the King County Correctional Facility ("KCCF").[1] (*See generally* 2nd Am. Compl. (Dkt. # 9).) Defendant moves for summary judgment, arguing that he did not violate Plaintiff's constitutional rights and that he is entitled to qualified immunity. (Mot. (Dkt. # 23).) Plaintiff opposes summary judgment (Resp. (dkt. # 44)),

---

[1] Plaintiff brings other claims against additional Defendants but agrees that those claims should be dismissed. (Dkt. # 44 at 1 ("[T]his Court should GRANT Defendants' motion for summary judgment for all defendants except Defendant Verhelst."), 9 ("Plaintiff concedes to summary judgment as to all defendants except Defendant Verhelst . . . .").) Therefore, this Report and Recommendation is limited to the merits of his claim against Defendant.

REPORT AND RECOMMENDATION - 1

1 and Defendant filed a reply (Reply (dkt. # 58)). Having considered the parties' submissions, the
2 balance of the record, and the governing law, the Court recommends that the motion for
3 summary judgment be GRANTED based on qualified immunity.

## II. BACKGROUND

### A. Alleged Use of Excessive Force

On January 25, 2016, Plaintiff was housed on the tenth floor of the KCCF. (2nd Am. Compl. at 4.)[2] At approximately 6:00 p.m., activities officer Haiko Postma was preparing a group of inmates, including Plaintiff, to be released from their cell "tank" into the recreational yard. (*Id.*; Verhelst Decl. (Dkt. # 30) at ¶ 3.) While they were waiting in the tank, Officer Postma gave Plaintiff permission to retrieve two paper towels on his way into the yard. (2nd Am. Compl. at 4; McClam Decl. (Dkt. # 45) at ¶ 3.)

It is standard procedure for inmates to step out of the tank individually and check in at the officers' booth where the on-deck officer will record whether the inmate intends to remain in the tank or proceed out to the yard. (Verhelst Decl. at ¶ 4; McClam Decl. at ¶ 8.) Although not directly described by the parties, there is evidence in the record indicating that the officers' booth is on a landing at the top of several stairs, and inmates pass on the ground level below the booth to proceed to the yard. (*See* Dkt. # 45-4 (Photographs of Officers' Booth); IIU Report (Dkt. # 45-6) at 4.)

Defendant was the on-deck officer that evening. (Verhelst Decl. at ¶ 3; McClam Decl. at ¶ 8.) He offered to record the inmates' location so Officer Postma could take a break, and Officer Postma agreed. (Verhelst Decl. at ¶ 3.) To the best of Defendant's knowledge at the time, Officer Postma left the general area to go on his break. (*Id.*)

---

[2] Plaintiff's second amended complaint is verified. (*See* 2nd Am. Compl. at 8; Dkt. # 45 at ¶ 2.)

REPORT AND RECOMMENDATION - 2

Defendant stood near the officers' booth, holding a clipboard with the inmates' names so he could record their whereabouts. (Verhelst Decl. at ¶ 4.) A box of paper towels was on the ground nearby. Plaintiff grabbed one paper towel "in full view" of Defendant. (McClam Decl. at ¶ 3.) Plaintiff attests that when he reached for the second paper towel, Defendant "came forward from his position" outside Plaintiff's reach, and "stomped hard" on Plaintiff's left hand, "causing extreme pain." (McClam Decl. at ¶¶ 3, 12; *see also id.* at ¶ 3 ("At no time did I reach for him or even get close to him with my hand."); 2nd Am. Compl. at 4 ("Officer Fran[t]z Verhelst stomped aggressively and with great force on my left hand.").) Plaintiff attests that Defendant "held his foot on top of [my] hand on the concrete for a few seconds without letting off." (McClam Decl. at ¶ 3.) Inmate James Zesati observed the incident and attests that Defendant "put all his weight [on Plaintiff's hand] and did not ease off even as I passed by toward the yard." (Zesati Decl. (Dkt. # 46) at 3.)

Defendant tells a different story. According to Defendant, the box of paper towels was directly at his feet. (Verhelst Decl. at ¶ 5.) Defendant attests:

> As Mr. McClam stepped forward toward me, I saw through the bottom of the clipboard I was holding, his hand unexpectedly reach[] out toward my ankle/pants area. I reacted almost instinctively and lifted my foot and put it on top of [Plaintiff's] left hand *briefly*, which was now on top of the paper towel box. I di[d] not have time to say anything to Mr. McClam before he reached out with his left hand and my response was a 'reflex' to a movement I perceived as an attempt by Mr. McClam to inappropriately assault me. I quickly removed my boot from the top of Mr. McClam's left hand and he withdrew it back to his body.

(*Id.* at ¶¶ 6-9 (emphasis in original, alterations added).) Plaintiff had not asked Defendant for permission to grab any paper towels, and Defendant was not aware that Plaintiff had obtained permission from Officer Postma. (*Id.* at ¶ 9.)

Plaintiff and Defendant then "exchanged some heated words." (McClam Decl. at ¶ 3; *see also* Verhelst Decl. at ¶ 9; 2nd Am. Compl. at 4.) Upon hearing the dispute, Officer Postma

REPORT AND RECOMMENDATION - 3

1  returned to the area and informed Defendant that he had approved Plaintiff's request for paper

2  towels. (Verhelst Decl. at ¶ 11.) Defendant asked Plaintiff if he wanted medical attention, and

3  Plaintiff declined. (*Id.*) Defendant also asked Plaintiff if he still wished to go to the yard, and he

4  responded affirmatively and proceeded outside. (*Id.*) Defendant then made a note in the 10 S

5  logbook regarding the incident, stating, "I did put my foot on top of his hand but did not put

6  pressure." (IIU Report at 9; *see also* Dkt. # 45-7 (Logbook).)

7  Once in the yard, Plaintiff attempted to work out, but his left hand was too painful.

8  (McClam Decl. at ¶ 4.) After about five minutes, he requested medical attention. (*Id.*)

9  **B. Medical Care**

10 At approximately 8:15 p.m. on January 25, 2016, a nurse came to Plaintiff's cell. (Temko

11 Decl. (Dkt. # 26) at ¶ 6; *see also id.* at Ex. 1 (1/25/2016 Nursing Progress Note).) Plaintiff had

12 full range of motion, reported pain upon light palpitation, and had no swelling. (*Id.* at ¶ 7.) The

13 nurse gave him an ice pack and scheduled him for a follow-up visit. (*Id.*)

14 The next morning, Plaintiff was seen by a different nurse, who noted minimal swelling

15 and slightly limited range of motion. (Dkt. # 45-3 at 3-4 (1/26/2016 Nursing Progress Note).)

16 She prescribed ibuprofen and scheduled him for an x-ray at Harborview Medical Center. (*See id.*;

17 Sanders Decl. (Dkt. # 27) at ¶ 7.) On January 28, 2016, Plaintiff was seen for a third time; the

18 nurse noted "mild dorsal hand swelling with fingers splinted." (Dkt. # 45-3 at 5 (1/28/2016

19 Nursing Progress Note).)

20 On January 29, 2016, Plaintiff's hand was x-rayed at Harborview Medical Center; the x-

21 rays showed no fracture, normal alignment, and no soft tissue abnormality. (Sanders Decl. at ¶

22 7.) Plaintiff was diagnosed with a left-hand contusion. (*Id.*)

23

### C. Investigations into Incident

On January 26, 2016, Internal Investigations Unit ("IIU") Sergeant Rachel Wilks opened an investigation after Plaintiff complained to her that Defendant had assaulted him. (Wilks Decl. (Dkt. # 29) at ¶¶ 5-6.) During the investigation, Defendant admitted that he could have stepped back instead of stepping on Plaintiff's hand. (Dkt. # 45-8 (5/13/2016 Interview of Defendant) at 20.) On August 1, 2016, Sergeant Wilks completed her investigation and wrote up a report, which was forwarded to her captain, then to the KCCF major, and finally to the KCCF Commander for final findings regarding Plaintiff's complaint. (*Id.* at ¶ 7; *see generally* IIU Report.) KCCF Commander Gordon Karlsson exonerated Defendant of the allegation that he violated Policy 3.00.215(5) ("Brutality, physical violence, intimidation or corporal punishment of inmates by employees will not be permitted nor will force be used beyond that necessary to subdue an inmate."). (Karlsson Decl. (Dkt. # 28) at ¶¶ 4, 6.) Commander Karlsson explained that Defendant's response to Plaintiff's "unexpectedly reaching toward his ankles/pants during this process, without permission, was not inappropriate and [was] consistent with DAJD policy that corrections officers maintain security and order within the KCCF, both for their safety and the safety of all the inmates." (*Id.* at ¶ 9.) Commander Karlsson also found that Defendant made a false or misleading statement regarding the incident in the logbook. (*See* IIU Report at 11.)

Plaintiff filed a separate complaint with the King County Ombudsman's Office, which reviewed the incident and concluded that Defendant's use of force, in response to his belief that his ankles were about to be grabbed, was made in self-defense and was not excessive. (*See* Oh Decl. (Dkt. # 31) at 4.)

### D. Ongoing Physical Issues

Plaintiff attests that as a result of Defendant stomping on his hand, he continues to suffer "regular shooting pain" in his left hand and a loss of strength in his left arm, which make normal daily activities difficult for him. (McClam Decl. at ¶ 10.) Holding a phone for more than a few minutes causes his hand to go numb. (*Id.*) Sleeping is difficult because holding his hand "in one place for any length of time causes discomfort and numbness." (*Id.*) Typing hurts, and he cannot participate in physical activities like basketball, tennis, and lifting weights. (*Id.*) Plaintiff attests that doctors have recently diagnosed him with a "contusional sprain" and told him he has "Ulner's disease or Guyon's disease, which [are] akin to carpal tunnel syndrome."[3] (*Id.*)

## III. LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The moving party bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by presenting evidence that negates an essential element of the nonmoving party's case, or by

---

[3] Plaintiff does not present medical evidence supporting these assertions.

establishing that the nonmovant lacks the quantum evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute. *Id.* at 252.

In ruling on a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The Court also may not weigh the evidence or make credibility determinations. *Anderson*, 477 U.S. at 248; *see also Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (district court cannot disregard evidence at the summary judgment stage solely based on its self-serving nature, even if it is uncorroborated, unless it "states only conclusions and not facts that would be admissible in evidence" (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002) (district court properly disregarded the declaration that included facts beyond the declarant's personal knowledge and did not indicate how she knew the facts to be true); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."))).

A verified complaint, like Plaintiff's, "may be treated as an affidavit to oppose summary judgment to the extent it is based on personal knowledge and sets forth specific facts admissible

REPORT AND RECOMMENDATION - 7

in evidence." *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (internal quotations omitted); *see also Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004); *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). But allegations that are based merely on Plaintiff's belief are insufficient to oppose summary judgment, as are unsupported conjecture and conclusory statements. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curiam).

**B.    Section 1983 Claims**

To sustain a § 1983 civil rights claim, Plaintiff must show: (1) he suffered a violation of rights protected by the Constitution or created by federal statute; and (2) the violation was proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

**IV.    DISCUSSION**

Defendant argues that he did not use excessive force against Plaintiff and that he is entitled to qualified immunity. (Mot. at 15-22.) The doctrine of qualified immunity protects government officials from civil liability under § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent prongs: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established

at the time of the incident." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (citing *Pearson*, 555 U.S. at 232). Either prong may be considered first. *Pearson*, 555 U.S. at 236. When addressing qualified immunity on summary judgment, the Court "may not resolve genuine disputes of fact in favor of the [moving] party" and must view the evidence in the light most favorable to the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

As discussed below, the Court concludes that a reasonable jury could find Defendant used excessive force but that it would not have been clear to a reasonable officer in Defendant's position that his conduct was unlawful.

**A. Excessive Force**

The Fourteenth Amendment's Due Process Clause protects pretrial detainees from excessive force. *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015). To prevail on such a claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-97. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case,'" without regard to the officer's underlying intent or motivation. *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Court must weigh the circumstances from the viewpoint of a reasonable officer at the scene, "including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* The Court also must "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal quotation and citation omitted). In assessing reasonableness, the Court may consider "the relationship between the need for the use of force and the amount of

force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

When viewed in Plaintiff's favor, the record establishes the following: (1) Defendant believed he was the only officer in the tank managing several inmates who were not restrained; (2) Defendant did not know Officer Postema had approved Plaintiff's request for paper towels; (3) Defendant was standing on a landing outside Plaintiff's reach when Plaintiff, who was standing on the ground level, reached in his direction to grab the second paper towel; (4) Plaintiff did not get close to Defendant with his hand; (5) Defendant perceived Plaintiff's action to be an attempt to inappropriately assault him; (6) Defendant came forward from his position to stomp hard on Plaintiff's hand; (7) Defendant held his foot on Plaintiff's hand for a few seconds; (8) Defendant could have stepped back instead of stomping on Plaintiff's hand; and (9) even though there were minimal medical findings after the incident, Plaintiff has had ongoing pain in his hand since.

Based on these facts and a consideration of the relevant *Graham* factors, the Court concludes that a reasonable jury could find that Defendant used objectively unreasonable force against Plaintiff. Because Defendant was standing beyond Plaintiff's reach when Plaintiff reached in his direction, a reasonable officer on the scene would not have perceived the need to use *any* force. Indeed, Defendant was on a raised landing and could have stepped back even further away from Plaintiff, who was on the ground level. Plaintiff's injury has caused long-lasting pain in his left hand. Defendant did not temper the amount of force used and instead stomped hard on Plaintiff's hand, holding his foot in place for a few seconds rather than immediately removing it. The security problem could not be described as severe—from the

perspective of a reasonable officer with Defendant's knowledge, Plaintiff unexpectedly reached in his direction while he stood out of Plaintiff's reach. Although Defendant believed Plaintiff was attempting to assault him, a reasonable jury could find that this belief was unreasonable given that Defendant was standing outside of Plaintiff's reach.

Defendant nevertheless asserts several reasons why he did not violate Plaintiff's constitutional rights. First, he argues that his use of force was minimal given that he reasonably perceived Plaintiff's action as a real threat to his own safety. (Mot. at 16.) As just discussed, however, viewing the evidence in Plaintiff's favor, a reasonable jury could conclude that he *un*reasonably interpreted Plaintiff's action as a legitimate threat. Second, Defendant argues that a reasonable corrections officer on the scene, seeing an inmate suddenly reach toward his ankle or pants had every right to use the minimal force he instinctively used. (*Id.* at 17.) But this argument fails to credit Plaintiff's testimony that Defendant was out of his reach when we went to grab a paper towel, as well as Defendant's own acknowledgement that he could have stepped back away from Plaintiff instead of stepping forward onto Plaintiff's hand.

Third, Defendant argues that *Kingsley* and *Graham* require the Court to account for the legitimate interests that stem from the government's need to manage the KCCF and appropriately defer to jail officials' judgment regarding the policies and practices needed to preserve internal order, discipline, and security. (*Id.*) Defendant thus suggests that the Court should defer to the determination of Commander Karlsson that Defendant did not use excessive force. (*Id.*) Defendant also points to the Ombudsman's Office's finding that Defendant did not use excessive force. (*Id.* at 17-18.) Commander Karlsson and the Ombudsman's Office, however, were not required to view the evidence in the light most favorable to Plaintiff, as the Court must on summary judgment. Accordingly, the Court's determination that a reasonable jury

could find Defendant's intentional actions objectively unreasonable does not run afoul of *Kingsley*'s and *Graham*'s guidance regarding deference to jail officials' judgment.

Fourth, Defendant argues that he acted in good faith, and "*Kingsley* . . . recognized that the objective standard as to use of force protects corrections officers who are acting in good faith." (Mot. at 18.) Defendant's assertion of good faith, however, is derived from his version of events, not Plaintiff's. As already stated, Plaintiff attests that Defendant was standing out of his reach when he went to grab the paper towel and that Defendant stepped forward to stomp on his hand even though Defendant could have stepped backwards. The Court recognizes that officers must make split-second judgments, and that Defendant has stated his belief that Plaintiff was reaching for his ankles and pants. Yet for the reasons discussed above, a reasonable jury crediting Plaintiff's evidence could conclude that Defendant acted unreasonably and not in good faith. In fact, even crediting Defendant's version of events, KCCF authorities determined Defendant lied about the incident in the logbook, suggesting that he attempted to hide his actions from his supervisors.

The Court recommends finding that Defendant has not established he is entitled to summary judgment on Plaintiff's excessive force claim.

**B. Clearly Established Right**

Under the second prong of the qualified immunity analysis, the Court must determine whether it would be clear to a reasonable officer that his or her conduct was unlawful in the situation he or she confronted. *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 227; *see also Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have

understood that he was violating it."). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco, Cal. v. Sheehan*, 575 U.S. 600, 135 S.Ct. 1765, 1774 (2015) (internal quotation marks and quoted source omitted). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201; *see also Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019) (per curiam) ("Courts must define the clearly established right at issue on the basis of the specific context of the case." (internal quotation and citation omitted)).

"Because the focus is on whether the officer had fair notice that [his or] her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela*, 138 S.Ct. at 1152 (quoted source omitted, alteration added). The Supreme Court's "caselaw does not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoted source omitted). The salient question is whether the state of the law at the time of the alleged constitutional violation gave prison officials fair warning that their decision was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018). It is the plaintiff's burden to establish that the law was clearly established at the time of the incident. *See Greene v. Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009), *vacated in part*, 661 F.3d 1201 (9th Cir. 2011).

Defendant argues that there is no authority that would put a reasonable officer on notice that his conduct violated Plaintiff's constitutional rights. (Mot. at 20-22.) In response, Plaintiff

does not identify any cases with similar facts. (*See* Resp. at 14.) The Court has identified two Ninth Circuit cases that warrant discussion. In *Felix v. McCarthy*, 939 F.2d 699 (9th Cir. 1991), the Ninth Circuit affirmed the denial of qualified immunity to a prison guard who, in response to a verbal disagreement with a handcuffed prisoner, threw the prisoner across a hallway onto the wall on the opposite side. *Id.* at 701. The court found that this use of force was the equivalent of "strong blows . . . for no purpose," which it had previously found unconstitutional. *Id.* The court discussed cases finding that unjustified attacks by prison guards violate prisoners' constitutional rights, and distinguished cases where "the prisoners were either violating prison rules or the guards were acting on a reasonable but mistaken belief that the prisoner posed a security threat." *Id.* at 702.

In *Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003), the Ninth Circuit also found that summary judgment was not proper where the diabetic plaintiff alleged that, in response to his attempts to get medical help, several sheriff's deputies pulled him to the ground of his cell "kicked him, punched him, hit him with batons or similar objects, twisted his arms and legs, poked his face, knuckled his ear and pepper sprayed him," and that the attack continued even after he was handcuffed. *Id.* at 412. In denying qualified immunity, the court relied on *Felix* as the clearly established law on point. *Id.* at 421-22.

*Felix* and *Lolli* clearly establish that an unprovoked and unjustified attack by prison guards violates a prisoner's constitutional rights. However, they do not sufficiently define the contours of the right such that "any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 138 S.Ct. at 1153. In both cases, the prisoners engaged verbally with the officers, who responded with physical attacks. In this case, Plaintiff made—from the perspective of a reasonable officer with Defendant's knowledge—an

unauthorized move with his hand in the direction of Defendant's ankles. Even though a reasonable jury could conclude that Defendant's response was objectively unreasonable and that no force was necessary, Defendant nevertheless reacted to Plaintiff's move in his direction; he was provoked by a physical gesture unlike the situation in *Felix* and *Lolli*. In addition, Defendant's use of force does not rise to the level of that used by the officers in *Felix* or *Lolli*. The Court thus concludes that clearly established law did not put Defendant on notice that his actions would violate Plaintiff's constitutional rights.

Plaintiff argues that Defendant is not entitled to qualified immunity because the infringement of his rights was obvious given that common sense dictates an officer cannot stomp on a person's hand hard enough to cause lasting injury when the person poses no threat. (Resp. at 14 (citing *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam)).) The Supreme Court in *Brosseau* stated that "in an obvious case," the *Graham* standard can be used as the clearly establish law, "even without a body of relevant case law." *Brosseau*, 543 U.S. at 199. *Brosseau* itself was not such an obvious case. *See id.* (holding that the officer was entitled to qualified immunity for shooting the plaintiff in the back while he was fleeing in his vehicle and placing bystanders at risk); *see also Kisela*, 138 S.Ct. at 1153 (violation not "obvious" where officer shot suspect who he believed was a threat to a bystander); *Mattos v. Agarano*, 661 F.3d 433, 452 (9th Cir. 2011) (violation not "so obvious" as to justify reliance on *Graham* to define clearly established law where officer shot plaintiff with taser in dart-mode). The Ninth Circuit has noted that cases will rarely qualify as "obvious." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454-55 (9th Cir. 2013) (where jury found that officer acted with purpose to cause civilian's death unrelated to any legitimate law enforcement objective, court concluded that "[t]his is one of those rare cases in which the constitutional right at issue is defined by a standard that is so

'obvious' that we must conclude—based on the jury's finding—that qualified immunity is inapplicable, even without a case directly on point"); *see also Adams v. Speers*, 473 F.3d 989, 994 (9th Cir. 2007) (denying qualified immunity where suspect's nondangerousness and officer's failure to warn before shooting placed the case squarely "within the obvious"); *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (per curiam) (denying qualified immunity because even though there was no prior case prohibiting the use of force under the same circumstances, "[a]ny reasonable officer should have known that holding an infant at gunpoint constituted excessive force"). This is not such an obvious case. Although Plaintiff argues he posed no threat, a reasonable officer with Defendant's knowledge would have perceived Plaintiff's move in his direction as unauthorized. Given such an unauthorized action, the Court cannot conclude that any reasonable officer should have known that Defendant's use of force violated Plaintiff's constitutional rights.

The Court thus recommends that Defendant's motion for summary judgment based on qualified immunity be granted.

## V. CONCLUSION

The Court recommends that the motion for summary judgment (dkt. # 23) be GRANTED and that this action be DISMISSED with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within

1  **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be
2  ready for consideration by the District Judge on **August 21, 2020**.
3        The Clerk is directed to send copies of this Report and Recommendation to the parties
4  and to the Honorable Richard A. Jones.
5        Dated this 29th day of July, 2020.

*[signature]*

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION - 17